Shauck, J.
The defenses relied upon under the plea of not guilty were (1) a failure of the state to prove that the accused had caused his mother’s death, and (2) that he was insane when that act was committed.
To prove that the accused took his mother’s life, the state, against his objection, was permitted to introduce a confession made by him while in the custody of an officer, but before a *102 warrant had been issued for his arrest. This confession was properly held to be voluntary. While“the testimony of the officer is somewhat confused as to the circumstances under which the confession was made, it shows thatfno promise of advantage was made to induce the confession, but that he was pressed to confess the truth because that would be best. The testimony of the prosecuting attorney shows that he had explicitly informed the accused that he could not hope for clemency in consideration of a confession, and that, if innocent, he ought to assert his innocence to the last.
This confession and the circumstances shown upon the trial warranted the jury in finding that on the night of January 11th, when the accused and his mother were alone at their home upon her farm, and when she was in bed, he took her life by crushing her skull with a maul.
But in connection with the defense of insanity,__the record presents more difficult questions as to both the rulings of the court and the weight of the evidence. The homicide occurred between six o’clock in the evening and two in the morning, and during that time no witness has any knowledge of the movements of either the accused or his mother. She was the owner in fee of the farm upon which they lived, and he was an only child, but no evidence tended to show that he coveted it, or that there had ever been trouble between them concerning it. Against the objection of counsel for the accused the state was permitted to elicit the opinions of medical witnesses upon an hypothetical case, which assumed, among other things, that after completing his work on the evening preceding the homicide, he ate supper, talked rationally with his mother, rested by the fire, and read while she attended to her duties, went to his room as usual, retired to bed, and passed into a natural sleep; that prior to this tragedy he had been very anxious to have control of the property which had been the subject of “sharp dispute and disagreement, sometimes amounting to angry talk and ugly feeling” between him and his mother. The question assumed these, and other less important facts, which no evidence in the case tended to establish. The objection of the accused to the question thus put was overruled by the court upon the ground that the jury were to determine whether the *103 facts assumed had been established by the evidence. That view would have been correct if it had been limited to such assumed facts as the evidence tended to establish. The question is to be settled by the familiar rule that the tendency of evidence is to be determined by the court, and its effect by the jury. In the absence of evidence tending to establish the material facts assumed as the basis of a professional opinion, the opinion is irrelevant. In the admission of such opinions in this case, the trial court erred. Williams v. Todd’s Ex’r, 28 Ohio St. 547. Certainly the admission of evidence that is irrelevant merely, does not always require the reversal of the judgment rendered, for it may not be prejudicial. But considering the circumstances of excitement under which this case is shown to have been tried, it would be unsafe to say that the opinions of eminent physicians based upon the hypothetical question were not pressed upon the jury to the prejudice of the accused. Especially is this true, in view of an instruction that was given, perhaps, for the purpose of relieving him of possible prejudice in this respect. The court said, “ I need hardly remind you that an opinion based upon an hypothesis incorrectly assumed, or incorrect in its material facts, and to such an extent as to impair the nature of the opinion, is of little or no weight.”
This instruction not only authorized a jury of laymen to determine what facts were material to a professional opinion, but it gave them discretion to attach a little weight to such opinions, no matter to what extent they were based upon facts falsely assumed. It cannot be said that the defense stood as well, as though the court had recognized the right of the accused to have such opinions wholly excluded from the consideration of the jury.
The defense of insanity presented in this case,was entitled to unprejudiced consideration from both court and jury. The homicide was most unnatural and cruel. The accused, twenty-two years of age, had always lived with his mother, except for a few months in the year preceding her death. He had never courted evil associations, did not drink, quarrel or fight, or in any other way educate himself for murder. There had never been any members of the immediate family except *104 himself, his father and his mother. His father was for many years subject to epilepsy, and the evidence leaves no doubt that its repeated seizures had seriously impaired his mental faculties. His mother was always peculiar, and in some respects unnatural, and at one time she was undoubtedly insane to such an extent as to justify her commitment to an asylum. His grandmother, an aunt, an uncle and a great aunt were insane. A number of his father’s relatives were victims of epilepsy, which in some cases induced imbecility, and, in one, a cousin, suicidal mania. Certainly, it cannot be said that every one is insane who has even so unpromising an heredity as this. But considering that so large a proportion of the insane — perhaps seventy-five per cent. — are found to have the inherited taint or predisposition, and considering further in how very small a proportion of the members of society this taint is found, proof of the heredity of the accused went far toward establishing the defense of insanity.
It was further proved that he had always shown marked peculiarities; that his eye was wild and unsteady, his gaze often fixed at a distance in space, his face showing at times extreme pallor, occasionally followed by flushes; that without known cause he would sometimes run swiftly for considerable distances, and that his nights were often followed by extreme languor. These are the most striking features of appearance and conduct, which sometimes attracted the attention of strangers, and excited the apprehension of friends. Their significance to a physician is made clear by that portion of Dr. Cook’s testimony, in which he gives the symptoms of mild epilepsy. Their effect upon others appears from the fact, that long before this tragedy, his mental condition was a cause of anxiety to his mother and to himself, and that while she was opposing his contemplated marriage to a young lady in the neighborhood, the family and friends of the latter sought to dissuade her, because of the conviction that he was mentally unstable, and the fear that he would become insane.
Opposed to this was the testimony of many witnesses who knew the accused well, and had seen nothing in his appearance or conduct to lead them to doubt his sanity; the testi *105 mony of witnesses as to the mental traits of his father and mother, which left unshaken the fact that she was insane and he an epileptic; testimony showing that he made some progress in school, and that he transacted unimportant business ordinarily well; the opinions of some medical witnesses, and the fact — which the evidence seems to establish- — that after the homicide he cunningly broke doors and windows in the house to avert suspicion from himself. The medical opinions are utterly worthless, not only for the reason already given, but because they are founded upon questions which wholly omit well established facts tending to establish the defense of insanity. The testimony of many of the witnesses will receive its proper weight, if it is remembered that there is no claim that the accused is an idiot.
The case does not now seem to call for an expression of opinion as to the weight of the evidence. Its substance is stated to show the impropriety of an important portion of the charge. The defense of insanity was founded upon the heredity of the accused and his appearance and conduct throughout his life. There was no evidence in the case from which a simulation of insanity could be inferred. But the court instructed the jury, in part, as follows :
“ Where, in a prosecution for homicide, the defense is i nsanity, it is uot sufficient if the proof barely shows that such a state of mind was possible, nor is it sufficient if it shows it to have been probable. The proof must be such as to overrule the legal presumption of sanity; it must satisfy you that he was not sane. It would be unsafe to let loose upon society great offenders upon mere theory, hypothesis or conjecture. A rule that would produce such a result would endanger the community, by creating a means of escape from criminal justice, which the artful and experienced would not fail to embrace. The defense of insanity is not uncommon. It isa defense often attempted, especially in cases where aggravated crimes have been committed, under circumstances which afford full proof of the overt acts, and render hopeless all other means of evading punishment. While, then, the plea of insanity is to be regarded as not less full and complete than it is a humane defense, when satisfactorily established, and while we should guard against in *106 flicting the penalty of crime upon the unfortunate maniac, or insane person, we should be equally careful that we do not suffer an ingenious counterfeit of the malady to furnish protection to guilt.”
We are aware thát this portion of the charge is copied from the charge in The State v. Clark, which was approved by the Supreme Court in 12 Ohio 483.
The report shows that the defense of insanity in that case was founded, in part at least, upon the demeanor of the accused after the homicide, and opinions founded thereon were given to the jury. It is to be inferred that some evidence in the case suggested the simulation of insanity. In a case presenting such evidence, it may have been proper to comment upon the circumstances under which the defense of insanity is “often attempted,” and to caution the jury against “an ingenious counterfeit of the malady.” But such observations had no proper place in the case before us, where a counterfeit of the malady was not suggested by any evidence. Their natural effect here, was to unwarrantably discredit a defense which the law recognizes,' and which counsel for the accused had interposed in good faith, to the end that the law might be vindicated. The charge, in a case of this character, ought not to be a dissertation upon the law of homicide. It ought to contain such directions pertinent to the accusation, the defense and the evidence, as will aid the jury in reaching a proper conclusion in the case in hand. Statements, however accurate, of irrelevant rules and principles, tend to confuse and mislead the jury; and, when of the nature of this, they are prejudicial to the accused.
Neither the high reputation of the judge who formulated this portion of the charge, nor the sanction given it by learned judges who have adopted it in this and other cases, ought to shield it from merited criticism. By it the jury were informed that the defense here interposed was not sustained, if the evidence merely shows that the accused was probably insane when the homicide was committed. It is submitted that this is not reconcilable with either reason or the best considered authority in the state. To the commission of the crime charged, mental capacity for deliberation *107 and premeditation was essential. If the evidence showed that this essential capacity was probably wanting — that the accused was probably insane when the homicide was committed — there was reasonable and substantial doubt of his guilt. Persons of the age of the accused are presumed to be responsible, and the burden of proving the defense of insanity was upon him. But it may be established by a mere preponderance of the evidence. Bond v. The State, 23 Ohio St. 349.
Thomas Millikin and Marsh & Marsh, for plaintiff in error.
A. M. Qrissler and J. W. King, contra.
There need be no confusion about the meáning of the words and phrases here used. According to authority and popular understanding that is probable which has more evidence for it than against it; and that fact is established by a preponderance of the evidence, which is supported by the greater weight of evidence — 'that is, which has more evidence for it than against it. This jury were told, in effect, that no degree of probability would answer the requirement of the law in this respect — that is, that it was incumbent on the accused to establish the defense beyond a reasonable doubt. In the erroneous understanding of the law thus given to the jury, they must have been fortified when further told that the evidence must “satisfy” them that the accused was not sane. It is true that in another portion of this dangerously voluminous charge, the rule in this respect was correctly stated, but we can not know which statement the jury accepted as correct.
Counsel are agreed that the argument before the jury took too wide a range; and it is manifest from the whole record, that the accused did not have the fair and impartial trial which was his right.
The execution of the sentence will be stayed, and at the next term the judgment will be reversed.